DAVID W. SCOFIELD - 4140
**PETERS | SCOFIELD**
*A Professional Corporation*
7430 Creek Road, Suite 303
Sandy, Utah  84093-6160
Telephone:     (801) 322-2002
Facsimile:      (801) 912-0320
Email: dws@pslawyers.com

**[Additional counsel on signature page]**

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ROSE PAPRAKIS, Individually and on Behalf of All Others Similarly Situated,<br>Plaintiff,<br><br>v.<br><br>SKULLCANDY, INC., S. HOBY DARLING, DOUG COLLIER, HEIDI O'NEIL, JEFF KEARL, SCOTT OLIVET, GREG WARNOCK, RICK ALDEN, and JASON HODELL,<br>Defendants. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(d)(4), 14(e) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**(Proposed Class Action)**<br><br>**JURY TRIAL DEMANDED**<br><br>Civil Action No. 2:16-cv-00810-bcw<br>Honorable  Brooke C. Wells |

Plaintiff Rose Paprakis ("Plaintiff"), by and through her undersigned counsel, brings this stockholder class action on behalf of herself and all other similarly situated public stockholders of Skullcandy, Inc. ("Skullcandy" or the "Company") against Skullcandy, S. Hoby Darling, Doug Collier, Heidi O'Neil, Jeff Kearl, Scott Olivet, Greg Warnock, and Rick Alden, the members of Skullcandy's board of directors (the "Board" or the "Individual Defendants"), and Chief Financial Officer Jason Hodell, for violations of Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78n(d)(4) 78n(e), 78t(a), and

United States Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. § 240.14d-9(d) ("Rule 14d-9"), in connection with acquisition of Skullcandy by Incipio, LLC ("Incipio" or the "Buyer") and Powder Merger Sub, Inc. ("Merger Sub").  Plaintiff alleges the following based upon personal knowledge as to herself, and upon information and belief, including the investigation of Counsel, as to all other matters.

## NATURE OF THE ACTION

1.      This shareholder class action arises because Skullcandy's board forced through a sale of the Company in order to reap personal benefits they negotiated with the Buyer to the detriment of Skullcandy's public stockholders.  The Board pushed through a merger pursuant to which the Buyer plans to acquire 100% of the outstanding shares of Skullcandy common stock through an all-cash tender offer (the "Tender Offer") followed by a second-step merger (the "Proposed Transaction").  The Buyer has offered Skullcandy investors $5.75 per share in cash, or a total of approximately $177 million (the "Offer Price" or "Merger Consideration").  The Agreement and Plan of Merger, is dated June 23, 2016.

2.      The Recommendation Statement on Schedule 14D-9 was filed on July 6, 2016 (the "Recommendation Statement").  In violation of Sections 14(e), 14(d)(4) and 20(a) of the Exchange Act, the Recommendation Statement contains incomplete and materially misleading information and omits certain information, which renders the information disclosed materially false or misleading regarding: (i) the process leading to the Proposed Transaction, including certain conflicts of interest and bids from other interested parties (ii) the financial analyses conducted by Peter J. Solomon Securities Company, LLC ("PJSC"), financial advisor to Skullcandy, and (iii) the projections used by PJSC in those analyses.

3.      The Merger is the product of a process that was corrupted in at least three respects.

2

4.      *First,* Derek Capo, founder of eFin and an investor of Skullcandy, issued an open letter requesting Skullcandy to release detailed financials of Astro Gaming business unit.[1]  Capo stated: "Astro Gaming was acquired in 2011 for $10.2 million and the company has NEVER broken down what percentage of the revenues, operating profit, and net income is contributed by Astro Gaming. Industry channel checks estimate that the revenues of Astro Gaming are between 10% to 25% of the total revenues of Skullcandy. This is material information that could significantly benefit shareholders."   Capo called Astro Gaming the hidden jewel of the Company.   The Board and the CFO negotiated the deal with the Buyer and the Board and management will receive accelerated cash payments each would not be entitled to receive absent the Merger.  By not making public the revenues, operating profit, and net income contributed by Astro Gaming, the Plaintiff and the public stockholders of Skullcandy cannot evaluate the fairness of the Offer.

5.      *Second,* the Recommendation Statement is misleading in that it fails to disclose all material information concerning the Merger.  As stated by Mr. Capo: "Astro Gaming deserves a high valuation given its strong growth and long-term potential, which is NOT being reflected in the acquisition price. We believe ASTRO gaming is worth at least $70 million or $2.50 a share given its growth and niche in the gaming industry. This valuation is based on a multiple of 1x to 3x revenues, if our estimates are correct. The Cash per share on the balance sheet is $44 million, or $1.50 a share, leaving the value of Skullcandy business segment at $1.75 or $50 million which is ridiculous given the segment generates more than $210 million in revenues and generates more than $10 million in operating income a year.  In addition, some of the financial analyses in the Recommendation Statement are misleading.  If these disclosures are not corrected, Plaintiff and

---

[1]      http://www.businesswire.com/news/home/20160708005779/en/Shareholder-eFin-Founder-Derek-Capo-Issues-Open

the class lack sufficient information to determine whether to seek appraisal and are entitled to a quasi-appraisal remedy.

6.      *Third*, the Merger Consideration is grossly inadequate in light of the Company's recent financial performance and strong growth prospects.  Indeed, the Merger Consideration is a 29.2% discount to the Company's 52-week high close price.

7.      Rather than using Skullcandy's future to the advantage of shareholders by negotiating a fair purchase price, the Individual Defendants chose to sell out the Company's shareholders in exchange for personal financial benefits they will obtain in connection with the Merger, including post-close employment.

8.      Defendants have now asked Skullcandy's stockholders to support the Proposed Transaction and tender their shares in the Tender Offer based upon the materially incomplete and misleading information Defendants disseminated to them via the Schedule 14D-9 Recommendation Statement.

9.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from closing the Tender Offer and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Skullcandy stockholders before the expiration of the Tender Offer, currently ***set for August 2, 2016***, or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

## PARTIES

10.      Plaintiff Rose Paprakis is, and has been at all relevant times, a stockholder of Skullcandy common stock.

11.      Defendant Skullcandy is a lifestyle-driven audio brand fusing technology with a passion for action sports, fashion, and music.  Inspiration for the brand was developed from a

chairlift in Park City, Utah.  The company is still headquartered there today, and its offices and culture very much embrace the action sports lifestyle.  Skullcandy products are sold in more than 70 countries worldwide and consist primarily of headphones and earbuds as well as speaker docks, mobile device cases, and apparel.  The company began trading publicly in July 2011.

12.     Defendant S. Hoby Darling ("Darling") is and was during the period relevant to this Complaint a director, President and Chief Executive Officer of the Company.

13.     Defendant Doug Collier ("Collier") is and was during the period relevant to this Complaint a director and Chairman of the Board of the Company.

14.     Defendant Heidi O'Neill ("Neill") is and was during the period relevant to this Complaint a director of the Company.

15.     Defendant Jeff Kearl ("Kearl") is and was during the period relevant to this Complaint a director of the Company.

16.     Defendant David Scott Olivet ("Olivet") is and was during the period relevant to this Complaint a director of the Company.

17.     Defendant Greg Warnock ("Warnock") is and was during the period relevant to this Complaint a director of the Company.

18.     Defendant Rick Alden ("Alden") is and was during the period relevant to this Complaint a director of the Company.

19.     The Defendants referred to in ¶¶ 12-18 above are collectively referred to herein as the "Board", and, together with Mr. Hodell, the "Individual Defendants."

20.     Defendant Jason Hodell is the Chief Financial Officer of the Company, and was directly involved in preparing the Company's financial projections that were relied upon by PJSC in connection with its financial analyses, which have been inadequately summarized in the

14D-9.  Mr. Hodell reviewed the section of the 14D-9 concerning the Company's financial projections before it was disseminated to stockholders, and intentionally chose to omit certain material information about the projections from the 14D-9.

21.     Non-party Incipio, LLC is a privately held company whose CEO and President is Andy Fathollahi.  Incipio designs and manufactures mobile device accessories and technologies. The company offers iPhone cases, smartphone cases, iPad cases, tablet cases and sleeves, laptop cases and sleeves, iPod cases, and custom cases; battery cases, portable battery packs, Qi charging bases, car chargers, wall chargers, and charging cables; lightning, micro-USB, and USB-C cables; and accessories that include bags, keyboards, screen protection products, and stylus pens, as well as audio products, such as high fidelity stereo earbuds.  It serves customers through retail stores in the United States; and resellers and dealers internationally. The company also sells products online.  Incipio, LLC was founded in 1999 and is headquartered in Irvine, California.  Incipio is a Delaware limited liability company.

22.     Non-party Powder Merger Sub, Inc. is a Delaware corporation, is a direct wholly owned subsidiary of Incipio formed in order to consummate the Proposed Transaction.

23.     Non-Party Peter J. Solomon Company ("PJSC") is an investment banking advisory firm that provides strategic advisory services to chief executive officers and senior management, owners of public and private companies, boards of directors, and special committees.  Its advisory services include Mergers and Acquisitions, Restructuring and Capital Markets across a range of industry verticals.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges

violations of Section 14(d), 14(e) of the Exchange Act and Rule 14d-9 promulgated thereunder and Section 20(a) of the Exchange Act.

25.     Personal jurisdiction exists over each Defendant either because the Defendant is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

26.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District; and (ii) Skullcandy has its principal place of business in Park City, Utah, within this District.

## SUBSTANTIVE ALLEGATIONS

**A.     THE INDIVIDUAL DEFENDANTS RAN A CONFLICTED PROCESS THAT FAVORED THEIR OWN INTERESTS AT THE EXPENSE OF SKULLCANDY'S PUBLIC STOCKHOLDERS**

27.     The Merger is the result of a flawed process where the part of the Board that was not interested remained uninformed and completely passive.   At the same time, conflicted members of the Board secured improper personal benefits and allowed the Buyer to acquire Skullcandy at a price that was unfair to the Company's public stockholders.

28.     The following table sets forth the number of shares held by the Company's directors and executive officers as of June 28, 2016 each will be entitled to receive pursuant to the Merger Agreement in respect of such Company Stock Options:

| Name | Number of Shares | Consideration Payable |
|---|---|---|
| **Executive Officers** | | |
| S. Hoby Darling | 75,251 | $ 432,693 |
| Jason Hodell | 22,717 | $ 130,623 |
| Sam Paschel, Jr. | 36,982 | $ 212,647 |
| David Raffone | — | — |
| Patrick Grosso | 14,324 | $ 82,363 |

| Non-Employee Directors | | |
|---|---|---|
| Rick Alden [1] | 708,597 | $ 4,074,433 |
| Jay Brown [2] | 21,684 | $ 124,683 |
| Doug Collier | 31,622 | $ 181,827 |
| Jeff Kearl [3] | 57,160 | $ 328,670 |
| Scott Olivet | 31,406 | $ 180,585 |
| Heidi O'Neill | 18,363 | $ 105,587 |
| Greg Warnock | 56,548 | $ 325,151 |

[1] Excludes shares of Common Stock held by Ptarmagin, LLC (" **Ptarmagin** "). Ptarmagin's two members are trusts of which Rick Alde and his children are beneficiaries, but the voting and dispositive power over Ptarmagin's shares of Common Stock is held by a third- party manager. Based on the information contained in the Schedule 13D/A filed by Ptarmagin and Mr. Alden with the SEC on June 14, 2016, Ptarmagin beneficially owns 3,639,886 shares of Common Stock.

[2] Mr. Brown ceased to be a director of the Company effective as of May 18, 2016.

[3] Represents (i) 43,510 shares of Common Stock held directly by Mr. Kearl and (ii) 13,650 shares of Common Stock held by Monarch Partners. Mr. Kearl is the manager of Monarch Partners and holds voting and dispositive power of the shares held by Monarch Partners Mr. Kearl may be deemed to indirectly beneficially own the shares held by Monarch Partners. The address of Monarch Partners is 38 Via Divertirse, San Clemente, California 92673.

29.     Thus, Defendant Alden and Defendant Darling will receive over $4 million and over $400,000, respectively.   Defendant CFO Hodell will receive $130,623.   In total, these directors and executive officers will receive over $6 million in connection with the Merger.

30.     The Proposed Transaction thus places what were illiquid blocks of shares in the Company into millions of dollars in the pockets of management and the Board, cash not one of them would have been entitled to but for the Merger.

**B.     THE DEFENDANTS FAILED TO OBTAIN FAIR VALUE FOR SKULLCANDY STOCKHOLDERS**

31.     The $5.75 per share Skullcandy stockholders will receive pursuant to the Merger is woefully inadequate.   Indeed, the Merger Consideration is a **discount of 29.2%** based on the Company's 52-week high closing price, and is also well below the price targets numerous analysts have set for the Company in recent months.

32.     Further, the open letter by shareholder and eFin Founder, Derek Capo, states that: "Skullcandy [alone] is worth more than $8 a share given cash flow of Skullcandy and growth potential of Astro Gaming, the hidden gem."[2]

33.     The Inadequate Merger Consideration is the result of a fundamentally flawed sale process, during which the Individual Defendants failed to reach out to numerous parties that would have been interested in acquiring the Company, negotiated personal financial benefits, including new employment agreements, for themselves, and gave preferential treatment to Incipio, to the detriment of other interested parties.

34.     Indeed, another interested party, Mr. Alden, specifically noted that he was frustrated with the speed at which the Company had pushed the sale process, which was largely dictated by Incipio's desire to wrap things up as quickly as possible, before other interested parties had time to submit a superior offer.

35.     Further, as Mr. Capo stated in his letter, there are at least 20 private equity companies and more than 15 strategic companies worldwide that would have been interested in purchasing all or part of the Company, had Defendants bothered to reach out to them and given them adequate time to conduct diligence.  Instead, the Defendants decided to only reach out to 4 strategic parties and 3 private equity investors.

36.     As a result of the fundamentally flawed sale process, Defendants failed to obtain adequate consideration for Skullcandy stockholders, who will suffer economic damages if the Proposed Transaction is consummated.

---

[2]     http://www.businesswire.com/news/home/20160708005779/en/Shareholder-eFin-Founder-Derek-Capo-Issues-Open

## C.   THE DEFENDANTS FAILED TO ADEQUATELY DISCLOSE ALL MATERIAL INFORMATION CONCERNING THE MERGER

37.    Defendants have now asked Skullcandy stockholders to accept the inadequate Merger Consideration by tendering their shares in the Tender Offer based upon materially incomplete and misleading information in the 14D-9.  It is critical that stockholders receive complete and accurate information about the Proposed Transaction prior to deciding whether to tender their shares.   To date, however, Defendants have failed to provide Skullcandy stockholders with such information.  As set forth in more detail below, the Recommendation Statement omits and/or misrepresents material information concerning, amongst other things: (1) interested parties' bids and their ability to make unsolicited offers to purchase the Company; (2) conflicts of interest faced by Skullcandy's management and the Company's financial advisor, PJSC; and (3) Skullcandy's financial projections, which were relied upon by PJSC in connection with performing the valuation analyses to support its fairness opinion.

*Material Information Regarding Interested Parties' Bids and Their Ability to Make Unsolicited Offers to Purchase the Company*

38.    The 14D-9 fails to provide any meaningful information about the superior proposal the Company received on June 24, 2016 from Mill Road Capital Management LLC ("Mill Road") to purchase the Company for $6.05 per share in cash, which would benefit shareholders by over $8 million.  The 14D-9 merely states that the "Board will review the Mill Road Proposal carefully, in consultation with its financial and legal advisors, in due course." 14D-9 at 41.  Defendants have failed to provide any meaningful information to stockholders about the status of their "review" of Mill Road's superior proposal, including whether they will terminate the Merger Agreement to pursue to the deal with Mill Road, the status of Mill Road's diligence, the status of negotiations with respect to a definitive transaction agreement, and whether Mill Road's proposal is subject to a financing condition or other conditions.  Skullcandy

stockholders would obviously find such information material, and the omission of such information renders the vague statements about Mill Road's offer on page 41 of the 14D-9 materially incomplete and misleading.  Defendants must therefore disclose such information to Skullcandy stockholders immediately, as the Tender Offer is scheduled to expire on August 2, 2016.  Defendants must also accept Mill Road's superior offer or any other undisclosed superior offer that has emerged, or insist that Incipio increase its offer.

39.     The 14D-9 also fails to disclose whether the standstill provisions in the nondisclosure and standstill agreements ("NSAs") that the Company entered into with the various interested parties (including Party A, Party B, Party C, Party D, Party E, Party F, Mr. Alden and SKDY) remain in effect.  Stockholders would find it material to know whether the parties that expressed an interest in acquiring the Company remain contractually prohibited from making unsolicited offers to purchase the Company.  The omission of this information renders the vague statement in the 14D-9 that the standstill provisions in the form NSAs that the Company sent to each of the potentially interested parties "*would terminate if the Company engaged in certain strategic transactions*" materially incomplete and misleading, 14D-9 at 4, because stockholders currently have no idea whether the Proposed Transaction is one of the "certain strategic transactions" that caused the standstill provisions to terminate.  The 14D-9 must therefore explicitly state whether any of the interested parties that entered into NSAs with the Company are still bound by the standstill provisions.

40.     Further, the 14D-9 fails to disclose any details concerning the bids from sponsors that Party B received in connection with its proposal.  On May 16, 2016 Party B informed PJSC that it would begin reaching out to private equity sponsors to seek a potential partner to help Party B sell off the Company's businesses, other than Astro Gaming, following its potential

11

acquisition of the Company.  Party B was primarily interested in acquiring the Company's Astro Gaming product lines, and therefore sought to partner with other parties to bid on the entire Company.  The 14D-9 indicates that as of June 16, 2016, Party B had "received bids from sponsors" to facilitate a joint purchase of the entire Company, 14D-9 at 22, but Defendants have intentionally withheld the value of the bids Party B received.  Such information is material to stockholders, as it directly relates to the value of the Company, including the value of the Company's Astro Gaming unit and its other businesses.  The omission of this material information renders the vague statement in the 14D-9 that none of the bids "were strong enough to allow Party B to bid on the Company's entire business" materially incomplete, false and misleading, because: (i) Company B had already previously submitted a "bid on the Company's entire business", *see* 14D-9 at 17; and (ii) stockholders have no idea what Defendants consider to be "strong enough" bids.

### *Material Information Regarding Management's Conflicts of Interest*

41.    The 14D-9 fails to disclose a key piece of material information concerning a significant conflict of interest that tainted the strategic review process – the dates that Skullcandy management negotiated the terms of their post-close employment with Incipio.  Specifically, while the 14D-9 states that Skullcandy's CEO and director Mr. Darling, as well as certain of the Company's' other executive officers (Messrs. Hodell, Paschel, Raffone, and Grosso) entered into amended and restated employment agreements ("Amended and Restated Employment Agreements") that will enable them to keep their lucrative jobs with the post-close company, the 14D-9 fails to disclose when these executive officers negotiated the terms of their respective Amended and Restated Employment Agreements.  The timing of such negotiations constitutes material information to the Company's stockholders, as it is necessary for them to determine whether the strategic review process was tainted by management's personal employment

negotiations.  Indeed, the Company provided Incipio with preferential treatment in the sale process; Mr. Alden specifically noted that he was frustrated with the speed at which the Company had pushed the sale process, which was largely dictated by Incipio's desire to wrap things up as quickly as possible, before other interested parties had time to submit a superior offer.  The 14D-9 must therefore disclose the dates upon which Skullcandy management negotiated their Amended and Restated Employment Agreements, so that stockholders are able to assess to what extent management's personal financial interest in the Proposed Transaction infiltrated and tainted the sale process.  The omission of such information renders the generalized discussion of management's Amended and Restated Employment Agreements and the Board's consideration of "the fact that certain of the Company's officers and directors…may have interests in the transaction…that are different from, or in addition to, those of the Company's other stockholders" to be materially incomplete and misleading, because stockholders cannot properly assess the extent to which management's post-close employment negotiations impacted the sale process.

42.    Further, while the 14D-9 and PJSC's fairness opinion letter to the Board suggests that Incipio or its affiliates may already hold a certain amount of Skullcandy's outstanding shares of common stock, *see* 14D-9 at 2, Annex I, the 14D-9 fails to disclose the *amount* of Skullcandy stock Incipio or its affiliates already hold.  Such information is material to stockholders so that they can assess exactly what percentage of the Company's shares need to be tendered for the Proposed Transaction to be effectuated.  The omission of such information renders the statement in the 14D-9 at page 2 that the number of shares tendered, "when added to the Company Shares then owned by Purchaser" need to represent a majority of the outstanding Company shares in

order for the Proposed Transaction to be effectuated misleading, because stockholders currently have no idea how many Skullcandy shares "Purchaser" or Incipio already own.

*Information Necessary for Stockholders to Assess the Financial Advisor's Conflicts of Interest*

43.     It is well-settled that information that bears on whether an investment bank faces conflicts of interest is material to stockholders when deciding whether or not to support a merger. It is imperative for the stockholders to be able to understand what factors *might* influence the financial advisor's analytical efforts.  A financial advisor's own proprietary financial interest in a proposed merger must be carefully considered in assessing how much credence to give its analysis.   Thus, all factors that may entice a financial advisor to favor a particular transaction must be fully disclosed.   Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, courts have required full disclosure of investment banker compensation and potential conflicts.   Here, the 14D-9 omits several pieces of material information that are necessary for Skullcandy's stockholders to assess whether the Company's financial advisor faced conflicts of interest.

44.     First, the 14D-9 fails to disclose the amount of fees that PJSC has received for the financial advisory services it has provided to the Company and its affiliates in the past two years, as explicitly required by SEC regulations, *see* 17 C.F.R. 229.1015(b)(4).  Instead, while the 14D-9 states that PJSC has in fact provided such services to the Company, it states that PJSC "has not received any *material* fees for rendering these services."   14D-9 at 38.  This statement is misleading, because stockholders have no idea what Defendants or PJSC consider to be a "material" fee; indeed, a financial advisor that makes hundreds of millions of dollars a year may not deem a fee of a few million dollars to be "material" to its overall finances, but such

14

information is nonetheless required by SEC regulations and material to stockholders because it directly relates to the legitimacy of the advisor's fairness opinion.

45.     Further, while the 14D-9 notes that Natixis, S.A. ("Natixis") became the holder of a majority of PJSC's outstanding equity on June 8, 2016, in the middle of the sale process, the 14D-9 fails to disclose whether Natixis has provided any financial advisory services to the Company, Parent or their affiliates in the past two years, and, if so, the amount of fees it has earned for such services.  14D-9 at 38.  Because Natixis acquired a significant ownership interest in PJSC during the sale process and therefore stands to directly benefit from PJSC's contingent fee, stockholders would find such information material.  The omission of this information renders the vague statement in the 14D-9 about Natixis' affiliation with PJSC, and that "PJSC has not provided financial advisory services to Parent, Purchaser and any of their respective affiliates" materially incomplete and therefore misleading.

46.     Additionally, the 14D-9 states that Goode Partners LLC ("Goode") is a significant stockholder of Parent, and that "Natixis or its affiliates may have co-invested with Goode from time to time and may have invested in limited partnership units of affiliates of Goode."  14D-9 at 38.  The 14D-9 fails to provide any meaningful information about the financial relationship between Natixis and Goode, including whether Natixis stands to benefit from the Proposed Transaction by virtue of the "limited partnership units of affiliates of Goode" it "may have invested in."  Such information is material to Skullcandy' s stockholders, as it necessary for them to assess whether the financial advisor upon whose fairness opinion they are being asked to rely faces a significant conflict of interest.  The omission of details about the financial relationship between Goode and Natixis, including details about the "limited partnership units of affiliates of Goode" that Natixis "may have invested in," renders the above-referenced vague statements

about the relationship between Natixis and Goode materially incomplete and therefore misleading.

<u>*Skullcandy's Financial Projections*</u>

47.     With respect to the "Certain Projections" section, the 14D-9 fails to disclose the date upon which the Company's management prepared the projections, and whether they were revised or updated from a previously existing set of projections.  Instead, the 14D-9 vaguely states that "*in connection with the Company's strategic planning process*, the Company's management prepared and provided to the Company Board and PJSC risk-adjusted, forward-looking financial information for the fiscal years 2015 through 2020 based upon projections developed by the Company."  14D-9 at 38.  The date upon which the Projections that PJSC relied upon to render its fairness opinion is material to stockholders, because it allows them to assess whether the Projections were prepared or revised by management in order to ensure that the banker could render a fairness opinion.  The omission of this information renders the statement that the projections were prepared "in connection with the Company's strategic planning process" incomplete and misleading, because the statement leaves stockholders clueless as to when the projections were actually prepared.

48.     The 14D-9 also fails to disclose management's "estimates of fresh cash flow for the Company for the years 2016 through 2020", which were explicitly relied upon by PJSC in conducting its Illustrative Discounted Cash Flow Analysis ("DCF Analysis").  14D-9 at 36.  A company's cash flow projections are widely recognized as material information in connection with all-cash mergers, because under sound corporate finance theory, the value of stock should be premised on the expected future cash flows of the corporation.  The question that Skullcandy investors should be asking in determining whether to tender their shares is therefore clear: is the price being offered now fair compensation for the benefits I will receive as a stockholder from

the future expected cash flows of the corporation if the corporation remains as a going concern? Because Defendants have intentionally excised the Company's cash flow projections from the 14D-9, Skullcandy stockholders are unable to answer this fundamental question.  The omission of the cash flow projections renders the summary of the DCF Analysis in the 14D-9 materially incomplete and misleading, because without the omitted projections, stockholders are unable to determine whether the "range of illustrative present values of $5.89 to $9.28…" accurately reflects the value of their shares.  14D-9 at 37.  The 14D-9 is also false, because it specifically says that the cash flow projections are "reflected in the Projections" 14D-9 at 36, but they are not.  14D-9 at 39.

49.     Lastly, while Skullcandy's Astro Gaming segment is the Company's strongest brand and has experienced significant growth, Defendants have impeded stockholders' ability to properly value the Astro Gaming unit because they have never released broken down financials specifically for Astro Gaming.  Without broken down financials, stockholders are forced to speculate about Astro Gaming related revenues, operating profit, net income and other key financial metrics.  The Company's Astro Gaming specific financials are therefore material to stockholders, particularly because certain bidders expressed interest in purchasing solely the Astro Gaming segment, but Company management and the Board insisted on selling the entire Company.  The failure to disclose the Astro Gaming financials renders the financial projections included in the 14D-9 materially misleading, because stockholders are unable to determine what percentage of those projections derive from the Company's Astro Gaming unit, and are therefore unable to individually value the Company's Astro Gaming unit, which had standalone value to certain interested parties, such as Party B.

## CLASS ALLEGATIONS

50.     Plaintiff brings this Action as a class action pursuant to Fed. R. Civ. P. 23 individually and on behalf of all other holders of Skullcandy common stock (except defendants named herein and any person, firm, trust, corporation, or other entity related to or affiliated with them and their successors in interest) who are or will be threatened with injury arising from Defendants' wrongful actions as more fully described herein (the "Class").

51.     This action is properly maintainable as a class action.

52.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes there are thousands of members in the Class.  As of July 2016, there were 28,712,166 shares of Skullcandy shares issued and outstanding.  All members of the Class may be identified from records maintained by Skullcandy or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

53.     Questions of law and fact are common to the Class and predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:  (i) whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Recommendation Statement in violation of Section 14(e) and 14(d)(4) of the Exchange Act and Rule 14d-9 promulgated thereunder; (ii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and (iii) whether Plaintiff and other members of the Class will suffer  irreparable harm if the Proposed Transaction is consummated as presently anticipated.

54.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

55.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

56.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude maintenance as a class action.

## COUNT I

### Claim for Violations of Section 14(e) of the Exchange Act
### Against All Defendants

86.     Plaintiff repeats and realleges each allegation set forth herein.

87.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…"  15 U.S.C. §78n(e).

88.     As discussed above, Skullcandy filed and delivered the 14D-9 to its shareholders, which Defendants knew or recklessly disregarded contained material omissions and misstatements as set forth above.

89.     During the relevant time period, Defendants disseminated the false and misleading 14D-9 above.  Defendants knew or recklessly disregarded that the 14D-9 failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90.     The 14D-9 was prepared, reviewed and/or disseminated by Defendants.   It misrepresented and/or omitted material facts, including material information about the consideration offered to shareholders via the Exchange/Tender Offer, the intrinsic value of the Company, and potential conflicts of interest faced by certain Individual Defendants and the Company's financial advisor.

91.     In so doing, Defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of Section 14(e) of the Exchange Act.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the 14D-9, Defendants were aware of this information and their obligation to disclose this information in the 14D-9.

92.     The omissions and incomplete and misleading statements in the 14D-9 are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares or seek appraisal.   In addition, a reasonable investor would view the information identified above which has been omitted from the 14D-9 as altering the "total mix" of information made available to shareholders.

93.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the 14D-9, causing certain statements therein to be materially incomplete and therefore misleading.   Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the 14D-9, rendering certain portions of the 14D-9materially incomplete and therefore misleading.

94.     The misrepresentations and omissions in the 14D-9are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

## COUNT II

### Claim for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 (17 C.F.R. § 240.14d-9) Against All Defendants

95.     Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

96.     Defendants have issued the 14D-9 with the intention of soliciting shareholder support for the Proposed Transaction.

97.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.  Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

98.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof .

99.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

100.   The 14D-9 violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omissions render the Recommendation Statement false and/or misleading.

101.   Defendants knowingly or with deliberate recklessness omitted the material information identified above from the 14D-9, causing certain statements therein to be materially incomplete and therefore misleading.   Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the 14D-9, rendering certain portions of the 14D-9 materially incomplete and therefore misleading.

102.   The misrepresentations and omissions in the 14D-9 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

103.   Plaintiff and the members of the Class have no adequate remedy at law.

### COUNT III

**Claims for Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

104.   Plaintiff repeats and realleges each allegation set forth herein.

105.   The Individual Defendants acted as controlling persons of Skullcandy within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Skullcandy, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the 14D-9

filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and/or materially incomplete and therefore misleading.

106.     Each of the Individual Defendants were provided with or had unlimited access to copies of the 14D-9 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

107.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The 14D-9 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  Thus, the Individual Defendants were intimately connected with and directly involved in the making of this document.

108.     In addition, as the 14d-9 sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger. The 14D-9 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

109.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

110.     Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Tender Offer and Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement and obtain increased merger consideration for the Company's stockhlders;

C.      In the event Defendants consummate the Proposed Transaction, awarding damages to Plaintiff and the Class;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated this 19th day of July, 2016.

**PETERS | SCOFIELD**
*A Professional Corporation*


/s/ David W. Scofield
David W. Scofield
**PETERS | SCOFIELD**
*A Professional Corporation*
7430 Creek Road, Suite 303
Sandy, Utah  84093-6160
Telephone:    (801) 322-2002
Facsimile:    (801) 912-0320
Email: dws@psplawyers.com

**FARUQI & FARUQI, LLP**
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

-and-


**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde (Pro Hac Vice
Application forthcoming)
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 601-2610
Email: jmonteverde@faruqilaw.com

*Attorneys for Plaintiff Rose Paprakis*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Rose Paprakis ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed a draft complaint against SkullCandy, Inc. ("SkullCandy") and the other named defendants and has authorized the filing of a complaint substantially similar to the one I reviewed.

2. Plaintiff selects Monteverde & Associates PC and Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3. Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5. Plaintiff's transactions in SkullCandy securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6. In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, unless otherwise specified below.

7. Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 19th day of July, 2016.

Rose Paprakis

| Transaction (Purchase or Sale) | Trade Date | Quantity | |
|---|---|---|---|
| Purchase | 11/18/13 | 2,075 | |
| Purchase | 3/17/14 | 2,660 | |
| Purchase | 4/4/14 | 25 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |